UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 5:11-CV-11

TERRELL W. HAM                                                                    PLAINTIFF

v.

MARSHALL COUNTY, KENTUCKY, ET AL.,                                  DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on a Motion for Summary Judgment by Defendants
Marshall County, Kentucky and Jailer Roger Ford (DN 118).  Plaintiff has filed his response
(DN 130), to which Defendants have replied (DN 133). These matters are now ripe for
adjudication.  For the reasons that follow, Defendants' Motion is DENIED in part and
GRANTED in part.

**BACKGROUND**

Plaintiff Terrell Ham began his sentence at Marshall County Detention Center ("MCDC"
or "the Jail") on January 22, 2010. On Wednesday, February 17, 2010, Ham requested an
appointment with Nurse Ruby Starks because of pain and a knot in his left shoulder. (Starks
depo. 46; Ham Jan. 10 depo. 107.) Nurse Starks examined Ham and advised him he would need
to see Dr. H.W. Ford ("Dr. Ford") the next day about possible pain medication. (Starks depo. 46;
Ham Jan. 10 depo. 108.) Ham was able to walk to the medical room for his appointment with
Nurse Starks and did not appear to have problems moving his arms or legs. (Starks depo. 51;
Ham Jan. 10 depo. 110.)

Both Nurse Starks and Jailer Roger Ford ("Jailer Ford") were present during Dr. Ford's examination of Ham on Thursday, February 18, 2010.[1] Ham informed Dr. Ford that the pain was still in his left shoulder, but had also travelled down his left side to his lower back and spine. (Ham Jan. 10 depo. 112-13; Dr. Ford depo. 46.) Ham walked to his appointment and did not complain of any trouble walking. (Ham Jan. 10 depo. 110 & 113; Starks depo. 61.) Based on his examination of Ham and Ham's history of back pain, Dr. Ford prescribed a muscle relaxer. (Dr. Ford depo. 46 & 51-55.) This was the last time that medical personnel at the MCDC attended to Ham. (Starks depo. 59; Dr. Ford depo. 50.)

In the late afternoon of Friday, February 19, 2010, Ham was unable to walk to the cell door to get his medication. (Ham Jan. 10 depo. 121.) After a fellow inmate called the control room about Ham's condition, Deputy Jailer Jeff Schroader checked on Ham, who informed him that he could not move his legs and was numb down his left side. (Schroader depo. 9.) Deputy Schroader said he took Ham's condition "seriously" because "obviously it's not good if you can't feel your legs or … half your body." (*Id.* at 19.) Deputy Schroader called Jailer Ford, who said, "Yeah, get him in a wheelchair, get him up to booking and I'll contact the judge … [W]e'll get him a bond, see if we can't get … his family here to get him to some medical attention." (*Id.* at 9.) Jailer Ford then contacted Marshall County District Judge Jack Telle, who told Jailer Ford to "let him make bond, get checked out." (Jailer Ford depo. 51.) Jailer Ford went "straight to the judge" rather than calling Dr. Ford or Nurse Starks because he "felt pretty certain that they would probably want him checked out." (*Id.* at 55.)

---

[1] Jailer Ford "generally tr[ies] to … be in there anytime that [the] doctor is there" for security and to leave his staff free to do other tasks. He added that his attendance also keeps him up-to-date on inmates' medical problems. (Jailer Ford depo. pp. 28-29.)

Jailer Ford testified that when inmates are sent to the hospital, his staff transports the prisoners and MCDC generally pays for the transportation. (Jailer Ford depo. 29.)[2] However, in this case, MCDC staff contacted Ham's sister, Dottie Hamlet, and told her Ham was having an emergency and needed to go to the hospital. (Hamlet depo. 20.) Because Ham was serving a misdemeanor sentence and was sentenced on a commitment order, Jailer Ford did not feel there was a risk of Ham not returning after treatment. (Jailer Ford depo. 55, 60-61.) Jailer Ford does not think releasing inmates to their families for medical care is an uncommon practice among correctional institutions in Kentucky. (*Id.* at 61.)[3] When Hamlet and her husband arrived about fifteen minutes later, Ham was in a wheelchair in the corner. (Hamlet depo. 24.) Hamlet received instructions to take Ham to Marshall County Hospital and return immediately upon his discharge. (Hamlet depo. 23-24.) Ham was loaded in his sister's Jeep Liberty and the family went immediately to Marshall County Hospital.[4]

Ham was discharged from the hospital around 11:30 p.m. and Ham and his family returned to MCDC thereafter. Deputy Jailer Robert Milan was on duty when Ham and his family pulled up to the jail's sally port. Hamlet gave Deputy Milan Ham's discharge papers, and Ham indicated that he still could not walk. (Hamlet depo. 38; Milan depo. 10-11, 24.) Deputy Milan observed that the family appeared upset Ham had been released from the hospital,  and that they "said there was … other stuff going on with him, and … they was just mad, I guess, because they

---

[2] This statement echoes jail standard 501 KAR 3:090 Section 1(12), which dictates that "[i]f the prisoner is transported to a hospital … transport will be provided [by] Deputy Jailer, or Ambulance."

[3] Defendants' expert, James Daley, testified that "a lot of jails historically have allowed family members to transport inmates to get them out of their facility so they don't get saddled with a huge medical bill," but that he did not know whether that occurred in MCDC's case.

[4] Testimony is conflicting as to who loaded Ham into the vehicle. Hamlet testified in her deposition that her husband loaded Ham by himself (Hamlet depo. 25), while Deputy Schroader and Deputy Edwin Newcom, Jr. recall Deputy Schroader placing Ham in the vehicle (Schroader depo. 13-14, 25; Newcom depo. 21). Testimony from all parties, however, indicates that Ham had use of his arms when he left for the hospital. Hamlet testified that though he was shaking, he was able to hold the handle when her husband loaded him (Hamlet depo. 26 & 74). Deputy Schroader testified that he had Ham put his arms around his neck, and he lifted Ham out of the wheelchair in a cradle position and put him in the vehicle. (Schroader depo. 14 & 25-26.)

didn't get admitted. … [T]hey was talking about, they was going to have to get him in to see somebody else." (Milan depo. 13-14.)[5] Jail staff thereafter called Jailer Ford at home,[6] and he arrived roughly fifteen minutes later. (Hamlet depo. 38; Milan depo. 17.)

Upon arriving, Jailer Ford told Ham to get out of the vehicle, and said that "[Ham] could walk…there wasn't nothing wrong with him [and that] he was fine." (Hamlet depo. 39.) He was "cursing," accused them of "partying," and indicated a strip search would reveal if Ham "had any dope" on him. (*Id.*; Ham Jan. 10 depo. 135.) Hamlet denied Jailer Ford's accusations and told him to call the hospital to confirm the length of their visit. (Hamlet depo. 39.) At Hamlet's request, Milan gave Jailer Ford Ham's discharge papers as proof of their visit, and Jailer Ford appeared to familiarize himself with the papers before calling the hospital. (*Id.*; Milan depo. 21.)[7] Ham's discharge papers indicated that he had been diagnosed with "BILAT[ERAL] LOWER EXTREMITY PARASTHESIA OF UNDETERMINED ETIOLOGY." (ER Release, DN 139, exhibit 2.) The papers further indicated Ham was to "FOLLOW UP WITH NEUROLOGIST ON MONDAY," and should see his private physician if his symptoms persisted or worsened. (*Id.*)

Jailer Ford then stepped away to call the Marshall County Hospital. He spoke with a nurse whose name he cannot recall, who informed him that "they could not find [any]thing wrong with him. Possibly a bladder infection." (Jailer Ford depo. 64.) Based on his conversation

---

[5] Deputy Milan also testified that when Ham first arrived, he witnessed Ham roll onto his left side and "dig[] around in his crotch," which led him to believe Ham might be able to walk despite his assertions to the contrary. (Milan depo. 30-31.)

[6] It is customary for jail staff to notify Jailer Ford at home when an inmate returns to the hospital. (Milan depo. 14, 19-20.) Although Milan is unsure if Jailer Ford regularly returns to the jail after such notification, he remembers him doing so "several times in the past 10 years." (*Id.* at 16.)

[7] Jailer Ford disputes these facts. He testified that upon arriving he "asked Terrell what the problem was. He said he couldn't get out. And I asked, you know, what his diagnosis was." (Jailer Ford depo. 64.) *See also* Jailer Ford Affidavit, DN 133 exhibit A ("I did not cuss or otherwise verbally abuse [Ham] or his family on February 19th. I did, however, warn Ham that he 'had better make sure [he] didn't have any [contraband] on him when he came back into the jail,' or other similar words to that effect"). Deputy Milan doesn't remember if Jailer Ford spoke with Ham before calling the hospital, but remembers immediately giving Jailer Ford the discharge papers after he arrived. (Milan depo. 21 & 26-27.)

with the nurse and the fact that Ham had been released from the hospital, Jailer Ford decided to readmit Ham to the jail. (*Id.*)

After deciding to readmit Ham, Jailer Ford returned to the sally port to remove Ham from the vehicle. When Deputy Milan pulled Ham out of the vehicle, Ham "fell to his knees and flat on his face." (Hamlet depo. 40.) As Ham "kept telling him that he couldn't get up. He couldn't move his lower body," Jailer Ford "kept cursing, yelling at him" and had Deputy Milan pick Ham up underneath his arms and drag him across the sally port to the wheelchair waiting on the other side. (*Id.* at 41-42.)  Ham remembers the men dropping him again, and "[t]his time [his] face and all hit the concrete. And Roger Ford said, well, you son of a bitch, you can walk because I seen your leg move." (Ham depo. 138.) The men then lifted Ham into the wheelchair, and after Ham slid out of the chair, the men were able to put him in the chair. (*Id.*; Hamlet depo. 42.)[8]

Before placing Ham in a medical observation cell, the men searched Ham for contraband pursuant to MCDC policy. (Milan depo. 44; Jailer Ford depo. 71.) Milan recalls that Ham was able to assist the men in removing his shirt and roll onto his right side to face the wall. (Milan depo. 47.) Milan does not remember Ham moving his legs at any point during the search. (*Id.* at 49.) Ham had no contraband on him, and was placed under medical observation. (*See* Jail Log, DN 188, Exhibit H.) Though Ham was once observed holding a blanket over his head, none of the deputies saw Ham on his feet or moving his legs. (Gardner depo. 11; Loe depo. 12; Milan depo. 57; Schroader depo. 12.) At 7:35 a.m., Ham told Deputy Eugene Loe that he could not get

---

[8] Jailer Ford and Deputy Milan also dispute this account of events. Jailer Ford testified the pair "got a wheelchair, eased him out into the wheelchair and put him in a medical cell." (Jailer Ford depo. 64-65). *See also* Jailer Ford Affidavit, DN 133 exhibit A ("My deputy and I did not drop Ham or otherwise let him fall to the ground, when we moved him from his sister's vehicle to a wheelchair before he was readmitted to the Jail."). Deputy Milan recalls that Jailer Ford asked him to get a wheelchair for Ham and then the two men "had to pick him up underneath his arms to get him from [the vehicle] to the wheelchair." (Milan depo. 28-29.) He denies that Ham fell to the ground at any point during the transition. (*Id.*)

up to see a visitor. Loe noted this on the jail log, but also noted that Ham was "ok."[9] (Loe depo. 10-11; Jail Log, Exhibit H.) That morning, Jailer Ford called into the jail while he was at a political function in Hardin, Kentucky. (Jailer Ford depo. 73.) After learning that Ham had not been up throughout the night and morning, he spoke with Judge Telle, who was also attending the event, around 10 a.m. (*Id.* at 73-75.) "The judge said, 'Roger, let's make him a bond. Put him back in court in two or three weeks. Have him to bring me some medical documentation.'" (*Id.* at 73.)

After Judge Telle directed that Ham be released to seek additional medical care, MCDC staff called Mr. Ham's daughter, Jessica Ham. (Jessica Ham depo. 15.) Because she was at work, Jessica missed the call. (*Id.*) MCDC left a voicemail. (*Id.*) Although Jessica's shift normally ended at two, she had to stay at work longer because a co-worker arrived late. (*Id.* at 17.) Jessica "clocked out and checked [her] voicemail, and it was from the jail stating that [she] just need to come pick [Mr. Ham] up. It didn't say why." (*Id.* at 15.) Jessica and her children's father, Jon Pace, took her nephews to the jail to pick up her father. (*Id.* at 17.) When jail staff wheeled her father out, Jessica "started crying because [she] could tell his condition right away. … [H]e almost looked dead." (*Id.* at 24.)

Ham left MCDC six hours after Judge Telle directed his release, around 3:55 p.m. Jailer Ford and Deputy Newcom attribute this delay to waiting for Ham's family to pick him up. (Jailer Ford depo. 86-87; Newcom depo. 26.) Deputy Newcom cannot recall any problem at MCDC that would have prevented a deputy from transporting Mr. Ham to the hospital or an ambulance being called. (Newcom depo. 26.) Ham was admitted into the emergency room at Lourdes Hospital in

---

[9] Each entry in the jail log includes a description of Ham as "ok." Deputy Milan said when he wrote "ok," he meant that Ham was "still breathing, and talking, and there wasn't [contraband] found on him." (Milan depo. 56.) Deputy Newcom looked to make sure that Ham was "conscious and breathing" while he was in medical observation. (Newcom 15.) Jailer Ford indicated that the notation "okay" indicates "okay, I have checked him. Okay, I have talked to him." (Jailer Ford depo. 74.)

Paducah at 6:20 p.m. Testing revealed a spinal abscess and cord compression, which required

immediate surgery. Despite the surgery, Ham is now a paraplegic with weakness in his left arm.

Ham filed his original complaint with this Court on January 24, 2011, naming as

defendants Marshall Co.; Jailer Ford; MCDC Physician Dr. H.W. Ford; MCDC Nurse

Practitioner, Ruby Starks; the Marshall County Public Hospital District Corporation; Dr. Louis

Forte; and John and Jane Does, Nos. 1-10, "employees of and health care professionals at the Jail

and the Hospital" (DN 1). Ham amended his complaint on August 2, 2011, to add Doctors Scott

Wilson and William R. Wilson and their practice groups, Sterling Emergency Services of the

Midwest, Inc. ("Sterling") and Radiology Associates of Murray, PLLC ("RAM"), respectively.

Plaintiff has voluntarily dismissed or assented to summary judgment on his claims against RAM

and Dr. William R. Wilson (DN 54), Dr. Forte (DN 56), H.W. Ford (DN 97), and Ruby Starks

(DN 112). On November 27, 2012, the Court also granted summary judgment for Defendants

Sterling Emergency Services and Dr. Scott Wilson (DN 148). Ham alleges violations of 42

U.S.C. § 1983 and state law claims based upon negligence, gross negligence, and the tort of

outrage.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve

all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material

fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether

the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

As a preliminary matter, Ham has raised the issue of what evidence the Court may consider in ruling on the Defendants' Motion for Summary Judgment. Ham cites *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000), for the proposition that "the court should give credence to the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes *from a disinterested witness.*" (Pls.' Resp. DN 130) (quoting *Reeves,* 530 U.S. at 151) (emphasis added by Plaintiffs). Specifically, Ham argues that the Court should disregard Jailer Ford's deposition testimony that he spoke to an unidentified nurse because "this is precisely the type of pretextual, self-serving hearsay testimony that a jury would be entitled to reject, and that the Court must disregard in ruling on the County Defendants' motion for summary judgment." Defendants point out that the nurse's statement would not be hearsay, as it is not offered for its truth, but rather "to explain Jailer Ford's *inference* that Plaintiff was medically released and/or cleared to return to the Jail."

Defendants' argument is well-taken. Further, as a fellow court in this district has recently pointed

out:

> The Sixth Circuit Court of Appeals has addressed this issue in *Almond v. ABB Industrial Systems, Inc.,* 56 F. App'x 672, 675 (6th Cir. 2003). In *Almond,* the court found that an interpretation, such as the one proposed by Plaintiffs in the instant case, "both over-reads *Reeves* and leads to absurd consequences." *Id.* The court found that under certain circumstances, the testimony of the movant's interested witnesses can be considered by a court on summary judgment. *Id.* "In particular, '[t]he testimony of an employee of the [movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it readily could have been shown to be so.'" *Id.* (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2527, at 287 n. 9). Discussing *Almond's* holding, the Sixth Circuit found that "courts need not deny the conclusiveness of testimony of the moving party that 'is not contradicted by direct evidence, nor by any legitimate inferences from the evidence[,]' because the rule requiring that testimony be considered by the jury is not 'an absolute and inflexible one.'" *Stratienko v. Cordis Corp.,* 429 F.3d 592, 598 (6th Cir. 2005) (quoting *Chesapeake & Ohio Ry. v. Martin,* 283 U.S. 209, 218, 51 S. Ct. 453, 75 L. Ed. 983 (1931)). Accordingly, the issue "is not whether the district court [can] consider the affidavits of [interested witnesses] but instead whether the affidavits [are] uncontradicted." *Id.*

*Finn v. Warren County, Ky.*, 1:10-cv-00016-JHM, 2012 WL 3066586 at *5 (W.D. Ky. July 27,

2012). Like our fellow district court, "the Court finds that the Plaintiffs' general request that no

weight be given to the self-serving testimony of the respective Defendants is inappropriate.

Instead, the Court will address the admissibility of the Defendants' testimony on an individual

basis as necessary." *Id.* at *6. Having settled this preliminary matter, the Court now moves to the

merits of Defendants' motion.

## A. Section 1983 Claim: Deliberate Indifference (8th, 10th, and 14th Amendments)

In Count I of his Amended Complaint, Ham alleges violations of the Eighth, Tenth, and

Fourteenth Amendments. Defendants argue that the Tenth and Fourteenth amendments offer no

basis for relief. In the deliberate indifference context, "the Tenth Amendment provides no theory

under which Plaintiff can recover for the injuries he asserts." *Rice v. Chandler*, 3:07-CV-36-H,

2008 WL 1832214 at *3 (W.D. Ky. Apr. 22, 2008). Regarding Ham's Fourteenth Amendment allegation, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* (quoting *Albright v. Oliver,* 510 U.S. 266, 273 (1994)) (internal quotations omitted). Because the Eighth Amendment "provides an explicit textual source of constitutional protection against the sort of behavior of which Plaintiff complains … the Court considers it, rather than the Fourteenth Amendment, to be the appropriate guide for analyzing these claims." *Id.* (citations omitted). Finally, Ham failed to address Defendants' arguments against the applicability of these two amendments. Based on this district's substantive case law, and because the Court considers this claim to be waived, the Court will look only to the Eighth Amendment in determining Ham's federal claims. *See Finn*, 2012 WL 3066586 at *22 (citing *Ctr. for Biological Diversity v. Rural Utils. Serv.*, 2009 WL 3241607 at *3 (E.D. Ky. Oct. 2, 2009)).

## 1. Jailer Ford in his Individual Capacity

To establish a § 1983 cause of action under the Eighth Amendment, a plaintiff must demonstrate that the individual acted with "deliberate indifference" toward his medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Specifically:

> A Section 1983 claim asserting a constitutional violation for denial of medical care has objective and subjective components. The objective component requires the existence of a sufficiently serious medical need. . . . The subjective element requires an inmate to show that prison officials have a sufficiently culpable state of mind in denying medical care.

*Jones v. Muskegon Cnty,* 625 F.3d 935, 941 (6th Cir. 2010) (internal quotation marks and citations omitted). Thus, deliberately indifferent medical care is judged both objectively and subjectively.

### a. Objective Component

Under the objective prong, the medical need must be one that would be "obvious even to a lay person." *Mingus v. Butler,* 591 F.3d 474, 480 (6th Cir. 2010) (quoting *Blackmore v. Kalamazoo Cnty,* 390 F.3d 890, 897 (6th Cir. 2004)). Thus, Ham must present evidence that establish his medical needs were "sufficiently serious" to warrant medical attention. *Comstock v. McCrary*, 273 F.3d 693, 703-04 (6th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Here, Ham suffered from a spinal abscess at the C6 sensory level, located at approximately the same level as the Adam's Apple. (Dr. Hadi depo. 32-33.) The abscess ultimately required emergency surgery and left him paraplegic. Ham's physician, Dr. Bassam Hadi testified that if not treated properly, a spinal abscess can "absolutely" be fatal. (*Id*. 74.)

Jailer Ford asserts that he is not a trained doctor, and therefore the "source of the Plaintiff's parathesia was not outwardly visible to laymen." This point is well-taken. However, Ham complained of serious back and neck pain, and ultimately suffered complete paralysis of his lower body that left him unable to walk. This Court agrees with the Eleventh Circuit's observation that "paralysis is such an uncommon, serious, and traumatic event that even someone without any medical training would have recognized the situation as requiring immediate care by a doctor." *Fields v. Corizon Health, Inc.*, 11-14594, 2012 WL 3854592, at *9 (11th. Cir. Sept. 6, 2012). Furthermore, the Sixth Circuit has found a "[p]laintiff's complaints of back pain, loss of mobility and bladder incontinence" may constitute serious medical needs. *Taylor v. Franklin Cnty, Ky.*, 104 Fed. App'x 531, 538 (6th Cir. 2004) ("Such obvious signs of reoccurring incontinence and debilitating immobility were clear symptoms of a serious problem,

even if Defendants did not choose to believe Plaintiff.").[10] Thus, the Court holds that Ham has presented sufficient evidence from which a jury could find Ham's condition satisfied the objective component of his constitutional claim.

### b. Subjective Component

Even where an inmate suffers from an objectively serious medical condition, the prisoner must also meet the subjective component to state a cognizable § 1983 claim. Under the subjective prong, the inmate must "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock,* 273 F.3d at 703 (citing *Farmer,* 511 U.S. at 837)*.* It should be noted, however, that an accident, "inadvertent failure to provide adequate medical care," or an act of negligence does not rise to the level of an Eighth Amendment violation. *Estelle,* 429 U.S. at 105.

Although the subjective standard "is meant to prevent the constitutionalization of medical malpractice claims," a plaintiff is not required to show that the officer acted with the specific intent to cause harm. *Comstock,* 273 F.3d at 703 (quoting *Farmer,* 511 U.S. at 836).  Rather, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id*. For summary judgment purposes, this Court decides whether Jailer Ford could have perceived a substantial risk of harm to Ham. "Whether in fact [he] perceived, inferred or disregarded that risk is an issue for trial." *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006). "Officials, of course, do not readily admit this subjective

---

[10] Defendants distinguish *Taylor* because, unlike in this case, the defendants completely failed to treat the inmate, despite numerous complaints. (Defs.' Reply, DN 133, p. 8.) However, this factual distinction is relevant in deciding the *subjective* component of the Eighth Amendment violation, i.e. whether Jailer Ford disregarded Ham's serious medical need. The Court finds the *Taylor* court's classification of loss of mobility as an objectively serious medical condition relevant here.

component, so 'it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.'" *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 540 (6th Cir. 2008) (quoting *Comstock*, 273 F.3d at 703). Further, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (quoting *Farmer*, 511 U.S. at 842).

### i.   Jailer Ford Perceived Facts from which He Could Infer a Substantial Risk to Ham

The Court finds that, when viewed most favorably to Ham, a reasonable trier of fact could conclude Jailer Ford was deliberately indifferent to Ham's medical needs. The facts show Jailer Ford was present when Ham began complaining of neck and back pain. MCDC staff informed Jailer Ford when, a day after seeing Dr. Ford, Ham's condition had progressed to the point that he could no longer walk or move his lower extremities. Jailer Ford testified that he went straight to Judge Telle rather than consult Dr. Ford or Nurse Starks because, based on Ham's condition, he "felt pretty certain that they would probably want him checked out." Jailer Ford personally witnessed Ham's inability to walk after his return from the hospital when he and Deputy Milan had to help Ham into a wheelchair. Although a nurse told Jailer Ford they could not find anything wrong with Ham, Jailer Ford read the discharge papers that indicated Ham had been diagnosed with bilateral lower extremity parathesia of undetermined etiology, was to follow up with a neurologist on Monday, and should contact a physician if his symptoms persisted or worsened (MCH discharge documents, DN 130, exhibit 2).

Ham was placed in a medical observation cell overnight, during which time none of the deputies observed him walking or moving his legs. Ham continued to complain of immobility when he refused a visit on the morning of February 20. After discussing Ham's status that

morning with jail staff, Jailer Ford talked to Judge Telle about releasing Ham that day for further medical treatment rather than wait until Monday. Based on these facts, a reasonable jury could determine Jailer Ford perceived a substantial risk to Ham's health.

Jailer Ford contends that he did not perceive a substantial risk to Ham because he relied on the judgment of Marshall County Hospital staff, who by releasing him indicated it was medically sound for Ham to return to the Jail. The Court agrees that, contrary to Ham's assertions, there is no evidence that Jailer Ford knew Ham's treatment at MCH was ineffective. Even if Jailer Ford knew Ham and his family were dissatisfied with his treatment there, this alone does not render Jailer Ford deliberately indifferent. As the Sixth Circuit has noted "[a] prisoner's difference of opinion regarding treatment does not rise to the level of an Eighth Amendment violation, … and, where the prisoner has received some medical attention and now disputes the adequacy of that treatment, the federal courts are reluctant to second-guess prison officials' medical judgments and to constitutionalize claims which sound in state tort law." *Lewis v. McClennan*, 7 Fed. App'x 373, 375 (6th Cir. 2001) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)) (internal citation omitted).

However, "'a prisoner is not required to show that he was literally ignored by the staff' to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611-12 (7th Cir. 2000)). A prison official may be found deliberately indifferent even after seeking medical treatment for an inmate when, confronted with "continued complaints by [an inmate]" or "manifest symptoms" of a continuing serious condition, the prison official nonetheless fails to seek additional medical attention. *See Cooper v. Dyke*, 814 F.2d 941 (4th Cir. 1987). Here, the Court does not find that Jailer Ford, a layperson, was not initially

14

entitled to rely on the judgment of the Marshall County Hospital. Rather, where Ham's continued "symptoms would have made it obvious that [an inmate] required immediate medical attention," a jury could find that delaying such required treatment constitutes deliberate indifference.

Further, Jailer Ford's contention that, because Ham had been treated on February 19, the need for further medical care on February 20 was not obvious to a layperson is not supported by the facts. Deputy Newcom, whose only medical experience is CPR and first aid training, testified Ham's symptoms on February 19 indicated a medical emergency and that nothing about Ham's condition had changed on February 20 to indicate his condition was any less urgent. Jailer Ford's actions support the inference that he too perceived Ham's condition to be serious. After Ham returned from the hospital, Jailer Ford had him placed under medical observation overnight. Based on his staff's overnight observations, he spoke with Judge Telle about releasing Ham for more treatment, despite having "something that says [Ham] needs to see a neurologist on Monday." (Jailer Ford depo. 87.) Based on the foregoing, the evidence supports a finding that Jailer Ford subjectively perceived facts that indicated a substantial risk of harm to Mr. Ham that required further treatment.

### ii.     Jailer Ford Disregarded a Substantial Risk

Furthermore, Ham has presented evidence from which a jury could conclude Jailer Ford disregarded that risk. Despite testimony that nothing prevented a deputy from transporting Ham to the hospital or calling the EMS pursuant to MCDC policy, staff called Ham's family requesting they pick up Ham, who did not arrive until nearly six hours later. A jury could conclude that Jailer Ford disregarded a substantial risk to Ham when he recognized Ham's need for further medical attention, ignored MCDC practice and policy requiring jail staff to transport Ham to this hospital, and instead allowed Ham to remain at the jail for an additional six hours

waiting for his family to arrive. *See Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (considering a defendant's failure to follow policy as evidence that the subjective prong of a deliberate indifference claim had been satisfied).

Ford cites to *Cairelli v. Vakilian*, which held that a jail physician did not disregard an obvious risk to an inmate suffering from heart disease because he "did not know what Cairelli's problem was, or what would be necessary to ease his discomfort." (Defs.' Reply (citing *Cairelli*, 80 Fed. App'x 979, 984-85 (6th Cir. 2003)). This case is distinguishable. There, the inmate's chest pains were not an obvious indication that he was suffering from heart disease, a condition that could only be ascertained through testing and diagnosis by a trained medical professional.

As discussed above, although Ham's spinal abscess was not obvious to a layperson, the sudden and unexplained inability to utilize one's lower extremities is an "obvious manifestation[] of pain and injury." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004). Thus, Jailer Ford would not be deliberately indifferent for failing to *diagnose* Ham; rather, a jury could find a constitutional violation where, when confronted with Ham's obvious and continuing need for medical treatment, Jailer Ford allowed six hours to pass before finally releasing him to obtain medical care. "This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity." *Id.*

Jailer Ford further rationalizes allowing Ham to wait six hours for his family to arrive rather than having Ham transported to the hospital by arguing it was Judge Telle, not Jailer Ford, who set the terms of Ham's release to his family. However, jail policy provides that "[i]f the

16

prisoner is transported to a hospital … transport will be provided [by] Deputy Jailer, or Ambulance." (See Jail Policy, DN 144, exhibit 1). Jailer Ford testified if Ham "would have shown obvious pain, even bleeding, something like that" he would have taken Ham to the hospital himself, indicating he did not view Judge Telle's order as prohibiting transport by jail staff. Accordingly, on the basis of these facts, taken in Ham's favor, there is a jury issue as to whether Jailer Ford "subjectively perceived facts from which to infer substantial risk to [Ham's health], that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703.

### c. Qualified Immunity

In *Harlow v. Fitzgerald,* the United States Supreme Court held that government officials performing discretionary functions are generally shielded from civil liability so long as their conduct does not violate constitutional rights or statutory provisions of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). There is "a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan,* 123 S.Ct. 808, 815 (2009).

> First, a court must decide whether the facts that a plaintiff has alleged ... or shown ... make out a violation of a constitutional right ... [s]econd, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

*Id.* at 815–16. Having determined Ham has put forth enough facts to make out a violation of a constitutional right, the Court must determine whether the law was clearly established at the time of Ham's illness. *Id.* It is clearly established that access to care for a serious medical need is a constitutional right. *See*, *e.g., Terrance*, 286 F.3d 834, 843-44. Defendants have not argued that such a right was not clearly established—only that Ham did not prove a constitutional violation.

Jailer Ford is not entitled to qualified immunity. Therefore, summary judgment for Jailer Ford is DENIED in regards to Ham's § 1983 claim.

### 2. Jailer Ford in his Official Capacity and Marshall County

Additionally, Ham has brought § 1983 claims against Jailer Ford in his official capacity as well as claims against Marshall County for the deprivation of his rights under the Eighth Amendment. The United States Supreme Court has held that a "suit against a state official in his or her official capacity is not a suit against the official, but rather a suit against the official's office." *Will v. Michigan Dept. Of State Police,* 491 U.S. 58, 67 (1989). As such, a suit against a government agent in his official capacity equates to a suit against the government agency in question.

### a. Policy of Inaction

Marshall County moves for summary judgment on the ground that the County does not have a custom or policy that violated Ham's constitutional rights under 42 U.S.C. § 1983. The Court finds that Ham has not produced evidence from which a reasonable juror could conclude that Marshall County is liable for deliberate indifference by virtue of an unconstitutional policy or custom.

A municipality may be held accountable for the actions of their employees *only* if these actions stem from the municipality's own unconstitutional and illegal policies. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690-91 (1978) (emphasis added). Simply stated, to present a viable claim, Mr. Ham must "identify the policy, connect the policy to [Marshall County] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't,* 8 F.3d 358, 363-64 (6th Cir. 1993) (quoting *Coogan v. Wixom,* 820 F.2d 170, 176 (6th Cir. 1987), *cert. denied,* 510 U.S. 1177 (1994)).

Further, Marshall County "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. "It is only when the execution of the government's policy or custom ... inflicts the injury that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (internal citation and quotations omitted); *see also Monell*, 436 U.S. at 694. In other words, the local government's policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson,* 454 U.S. 312, 326 (1981) (quoting *Monell,* 436 U.S. at 694).

In his complaint, Ham alleges Marshall County and Jailer Ford have a policy of "intentionally manipulating the bonding and release system to avoid the expense and inconvenience of attending the medical needs of the people in their care and custody …, and shifting such costs instead to the inmate's family, the Hospital and/or the taxpaying citizens of the Commonwealth of Kentucky." (Pl.'s Am. Compl. ¶ 16). However, Ham points to no evidence to support this allegation. Although defendants' expert James Daley, testified that "a lot of jails historically have allowed family members to transport inmates to get them out of their facility so they don't get saddled with a huge medical bill," there is no evidence before this Court that Marshall County or Jailer Ford acted with such motive in this case. Rather, Jailer Ford testified the practice of releasing inmates to their families is not uncommon in the state, and he did not question doing so here because Ham was serving a misdemeanor sentence and was sentenced on a commitment order. This is not enough to survive summary judgment.

Additionally, Ham appears to complain of Marshall County and Jailer Ford's failure to act to enforce existing emergency policy, or in other words, that the defendants maintained a custom or policy of "inaction." Before holding a municipality or official liable for deliberate

indifference toward an inmate's Eight Amendment right to adequate medical treatment through a policy or custom of inaction, a plaintiff has the burden of showing:

> (1) a clear and persistent pattern of mishandled medical emergencies for pre-arraignment detainees; (2) notice, or constructive notice of such pattern, to Madison Heights; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the "moving force," or direct causal link, behind the constitutional injury.

*Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). Here, there is no evidence that Marshall County, the jail, or Jailer Ford had a custom of denying medical treatment to inmates. Ham has pointed to no evidence that any such failures have occurred in the past. In fact, the testimony from the deputies and Jailer Ford is to the contrary. *See* Newcom depo. 24-25 (No officer has been punished for sending an inmate out for emergency care); Gardner depo. 20 (same); Schroader depo. 19-20 (same); Loe depo. 19 (same, citing his observations over the course of fifteen and half years). Further, Marshall County has implemented emergency medical procedures and policies dictating that inmates receive prompt medical attention comparable to that available to citizens in surrounding communities. (*See* DN 118, exhibits K and L.) There is no evidence that Marshall County was the "moving force" behind Ham's injuries. Therefore, Marshall County's motion as it pertains to a municipal custom or policy is GRANTED.

### b.  Failure to Train

Ham also advances an inadequate training or supervision theory of municipal liability. To succeed on a claim of failure to train Ham must establish that (1) Marshall County's training program was inadequate for the tasks the officers were required to perform; (2) the inadequacy was the result of Marshall County's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Finn v. Warren Cnty., Ky.*, 2012 WL 3066586 at * 20

(citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)). Only when the failure to train is a deliberate or conscious choice by the municipality can a county be liable under § 1983. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389 (1989).

In his response, Ham contends that "[t]here is simply no explanation for [Jailer Ford and his deputies'] abject disregard of their duties in Mr. Ham's case other than an absence of training and supervision." (DN 130). Specifically Ham points to the following evidence: (1) the deputies were only trained in first aid and CPR; (2) although Ham complained to Deputy Gardner that he could not move, Deputy Gardner testified "he did not note anything out of the ordinary" with Ham's condition; and (3) despite never witnessing Ham on his feet or moving after returning from the hospital, deputies failed to follow the Jail's emergency medical policy. These facts, Ham contends, are "reflective of the gross lack of training of deputies at the Jail to respond to an obvious medical emergency." (*Id*.)

While the evidence suggests the deputies may have violated some of the jail's emergency medical policies, Ham has not shown such violations were the result of inadequate training. Deputy Milan indicated that his training includes how to identify and respond to medical emergencies, and that an inability to walk is such an emergency. Deputy Newcom testified he does not view the jail policy's list of medical emergencies as all-inclusive, and that he would view an inmate's inability to use his legs as a "health-threatening situation" under the policy. Deputy Gardner likewise views the inability to walk or use one's legs as a medical emergency. Deputy Loe indicated that an inmate's unexplained inability to use his legs would be "something … of concern that needed to be referred to a physician." The deputies also indicated that they usually err on the side of caution when they encounter an inmate's medical complaints and seek treatment. (*See* Newcom depo. 25; Loe depo. 12 & 20; Gardner depo. 20; Milan depo. 36.)

At most, Ham has shown that, *despite* their emergency training, the deputies failed to follow emergency medical procedures. Even if the Court were to assume the deputies' training here was inadequate, Ham has failed to show this lack of training was due to Marshall County's deliberate indifference.  Accordingly, summary judgment in favor of Marshall County and Jailer Ford in his official capacity is GRANTED as to plaintiff's federal claims.

**B.  State Law Claims against Roger Ford in his Individual Capacity**

Defendants have argued, and Plaintiff has conceded, that Marshall County and Jailer Ford in his official capacity are entitled to sovereign immunity. Thus, the Court will not review these arguments and summary judgment is GRANTED as to Ham's state law claims against Marshall County and Jailer Ford in his official capacity. The Court now reviews the state law claims only as they apply to Jailer Ford in his individual capacity.

**1.  Qualified Immunity**

As a preliminary matter, the court must resolve whether Jailer Ford is entitled to qualified official immunity as to Ham's state law claims. Qualified official immunity attaches to "discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision and judgment ... in good faith; and within the scope of the employee's authority." *Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky. 2001). Where an official's acts are discretionary, a plaintiff must establish that such actions were not "in good faith." *See Woosley v. City of Paris,* 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008). Bad faith exists if an officer violated "a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, i.e., objective unreasonableness; or if the officer or employee willfully or

maliciously intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523.

The parties dispute whether Jailer Ford's actions were discretionary. However, where summary judgment is denied on constitutional theories brought under § 1983, claims of official immunity under *Yanero* and its progeny fail as well. *See Toon v. City of Hopkinsville,* No. 5:09–CV–37, 2011 WL 1560590 (W.D. Ky. Apr. 14, 2011). As noted above, Jailer Ford is not entitled to qualified immunity on Ham's federal claims, as there is a factual dispute as to whether Jailer Ford's conduct constitutes deliberate indifference. For the same reasons, Jailer Ford is not entitled to qualified immunity as to Ham's state law claims.

### 2. Negligence / Gross Negligence

In Kentucky, a negligence claim "requires proof that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons,* 113 S.W.3d 85 (Ky. 2003) (*citing Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245, 247 (Ky. 1992)). A plaintiff must also prove the defendant caused plaintiff's injury, which "consists of a finding of causation in fact, *i.e.*, substantial cause, and the absence of a public policy rule of law which prohibits the imposition of liability." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 553 (Ky. 2009) (quoting *Deutsch v. Shein,* 597 S.W.2d 141, 144 (Ky. 1980)). Kentucky has adopted the substantial factor test for causation set forth in § 431 of the Restatement (Second) of Torts, which explains that "[t]he word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense in which there always lurks the idea of responsibility[.]" R(2d) of Torts § 431, cmt. (a). In medical treatment cases such as this one, where causation of plaintiff's injury is not

"so apparent that laymen with a general knowledge would have no difficulty in recognizing it," the "causal connection between an accident and an injury must be shown by medical testimony and the testimony must be that the causation is probable and not merely possible." *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. Ct. App. 1965).

Neither party disputes that Jailer Ford had a duty to Ham, who at the time of his injury was an inmate under his charge. This Court has determined that an issue of fact remains as to whether Jailer Ford acted with deliberate indifference. For the reasons mentioned above, an issue of fact also remains as to whether Jailer Ford's conduct constitutes negligence or gross negligence. Now a paraplegic, there is no question that Ham has sustained an injury.

Thus, the key issue remaining is whether evidence of causation is sufficient to submit to a jury. This is a close call. Dr. Bassam Hadi, Ham's treating neurologist at Lourdes hospital, testified that Ham was a complete paraplegic when he presented to him at Lourdes. (Dr. Hadi depo. 63.) Because he received conflicting accounts from Ham, the Marshall County Hospital, and the jail as to the length of time Ham had been completely paralyzed, Dr. Hadi also testified that he could not say with reasonable medical probability how long Ham had been paralyzed. (*Id.* at 51 & 59). However, Dr. Hadi also indicated that there is "a certain period of time before [brain tissue] is irretrievably damaged because [function has] been silenced for so long" and that

> [o]nce you have loss of function that's complete, then the clock starts ticking. And most doctors will tell you if there's any function at all, it's an emergency. … [T]he key is when did he lose function. … [W]hen did he become a complete paraplegic. It's important even if he had rectal tone. That counts. That means he still has some function.

(*Id.* at 63). Although Dr. Hadi could not say with reasonable medical probability that Ham would have had a full recovery, he reported that if Ham had any neurologic function, be it sensory or motor, his chances of recovery at that time "would have definitely been better than" his condition when he arrived at Lourdes. (*Id.* at 69).

24

When viewing the evidence in a light most favorable to Ham, summary judgment is improper. The evidence shows that Ham was able to walk as late as Thursday, February 18. When Ham returned to the Jail late Friday night, he was able to lean onto his hip to adjust himself (Milan depo. 30-31), and he rolled onto his side during the contraband search (*Id.* at 48.) Jailer Ford testified that Ham never lost control of his bowels while at the Jail. (Jailer Ford depo. 68-69 & 73.) A reasonable juror could conclude these facts suggest that as late as Saturday morning, Ham's loss of function, and by extension his paralysis, was not "complete" and time was therefore of the essence in treating Ham's condition. Thus, a material issue of fact remains as to whether the six-hour delay in obtaining Ham treatment while he waited for his family to arrive was a substantial factor in Ham's injuries.[11] *See Richard v. Adair Hosp. Foundation Corp.*, 566 S.W.2d 791 (Ky. Ct. App. 1978) (summary judgment improper where fact issue as to defendant's negligence remained and medical testimony indicated child's chances of recovery would have been substantially greater and better had she been treated earlier). The issue of causation is a close call. The Court believes that either a trial deposition will be taken or Dr. Hadi will be present for trial. The Court feels more comfortable addressing this issue at trial. Thus, Roger Ford's motion summary judgment is DENIED as to plaintiff's negligence and gross negligence claims.

### 3.  Outrage

Ham's final claim is for outrage, or the intentional infliction of emotional distress. Kentucky has adopted the definition of this tort from the Restatement (Second) of Torts, which defines one who commits the tort of outrage as "... one who by extreme and outrageous conduct

---

[11] Jailer Ford points out that even after Ham's daughter picked him up from MCDC, it took them nearly two and a half hours to arrive at Lourdes Hospital, a distance of only 25 miles from the jail. While this fact is certainly one of many the jury would consider and weigh in determining causation, it does not support summary judgment on this issue.

intentionally or recklessly causes severe emotional distress to another...." Defendants argue that the claim is not available since Ham has alleged negligence which otherwise provides for recovery of damages related to one's emotional distress. Ham admits that an outrage claim cannot lie where a plaintiff's other claims have been time-barred or procedurally dismissed. However, he argues that it is an open question whether an outrage claim can serve as a gap filler where a plaintiff's traditional tort claims have been dismissed on their merits, citing *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44 (Ky. 2008). That decision does not address the issue in this case. In *Rigazio v. Archdiocese of Louisville*, the Kentucky Court of Appeals explained:

> Taking into account the history of the tort of outrage, and its reason for being as a "gap-filler" providing redress for extreme emotional distress in those instances in which the traditional common law actions did not, we believe that § 47 [of the Restatement (Second) of Torts] recognizes that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie. Recovery for emotional distress in those instances must be had under the appropriate traditional common law action. The tort of outrage was intended to supplement the existing forms of recovery, not swallow them up.

853 S.W.2d 295, 298-99 (Ky. Ct. App. 1993). Here, Ham has alleged commission of the traditional tort negligence, and the Court has found this claim survives summary judgment. Thus, negligence the appropriate vehicle of recovery for Ham's alleged emotional damages, not the independent tort of outrage. Therefore, Jailer Ford's motion for summary judgment on Ham's outrage claim is GRANTED.

**CONCLUSION**

For the foregoing reasons, it is HEREBY ORDERED THAT:

1) Defendants' Motion is GRANTED as to all claims against Marshall County, Kentucky and Jailer Roger Ford in his official capacity;

2) Defendants' Motion as to Plaintiff's claims against Jailer Ford in his individual capacity is GRANTED as to Plaintiff's Outrage claim but DENIED in all other respects.

CC: Counsel