# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION
# CASE NO. 5:11-CV-00011

**TERRELL W. HAM**  Plaintiff,

v.

**MARSHALL COUNTY, KENTUCKY, ET AL.,**  Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on a Renewed Motion for Summary Judgment by Defendant Jailer Roger Ford in his individual capacity. (Docket No. 160.) Plaintiff Terrell W. Ham has filed his response (Docket No. 161), to which Ford has replied, and Ham has filed a surreply (Docket No. 166). These matters are now ripe for adjudication. For the reasons that follow, Ford's Motion is DENIED IN PART and GRANTED IN PART.

## BACKGROUND

Plaintiff Terrell Ham began his sentence at Marshall County Detention Center ("MCDC" or "the Jail") on January 22, 2010. On Wednesday, February 17, 2010, Mr. Ham reported pain and a knot in his left shoulder and requested an appointment with Nurse Ruby Starks. (Starks Dep. at 46; Ham Jan. 10 Dep. at 107.) After examining Mr. Ham, Nurse Starks advised him that he would need to see Dr. H.W. Ford ("Dr. Ford") the next day about possible pain medication. (Starks Dep. at 46; Ham Jan. 10 Dep. at 108.) Mr. Ham was able to walk to the medical room for his appointment with Nurse Starks and did not appear to have difficulty moving his arms or legs. (Starks Dep. at 51; Ham Jan. 10 Dep. at. 110.)

Both Nurse Starks and Jailer Roger Ford ("Jailer Ford") were present during Dr. Ford's examination of Ham on Thursday, February 18, 2010. Mr. Ham informed Dr. Ford that the pain persisted in his left shoulder, but had also traveled down his left side to his lower back and spine. (Ham Jan. 10 Dep. at 112-13; Dr. Ford Dep. at 46.) Mr. Ham walked to his appointment and did not complain of trouble walking. (Ham Jan. 10 Dep. at 110, 113; Starks Dep. at 61.) Based on his examination of Mr. Ham, as well as Mr. Ham's history of back pain, Dr. Ford prescribed a muscle relaxer. (Dr. Ford Dep. at 46 , 51-55.) This was the last time that medical personnel at the MCDC attended to Mr. Ham. (Starks Dep at. 59; Dr. Ford Dep. at 50.)

In the late afternoon of Friday, February 19, 2010, Mr. Ham was unable to walk to the cell door to get his medication. (Ham Jan. 10 Dep. at 121.) After a fellow inmate called the control room about Mr. Ham's condition, Deputy Jailer Jeff Schroader checked on Mr. Ham, who informed him that he could not move his legs and was numb down his left side. (Schroader Dep. 9.) Deputy Schroader said he took Mr. Ham's condition "seriously" because "obviously it's not good if you can't feel your legs or . . . half your body." (Id. at 9.) Deputy Schroader called Jailer Ford, who said, "Yeah, get him in a wheelchair, get him up to booking and I'll contact the judge . . . [W]e'll get him a bond, see if we can't get . . . his family here to get him to some medical attention." (Id. at 9.) Jailer Ford then contacted Marshall County District Judge Jack Telle, who told Jailer Ford to "let him make bond, get checked out." (Jailer Ford Dep. at 51.) Jailer Ford went "straight to the judge" rather than calling Dr. Ford or Nurse Starks because he "felt pretty certain that they would probably want him checked out." (Id. at 55.)

Jailer Ford testified that when inmates are sent to the hospital, his staff transports the prisoners, and MCDC generally pays for the transportation. (Jailer Ford Dep. at 29.)[1] However, in this case, MCDC staff contacted Ham's sister, Dottie Hamlet, and told her that Mr. Ham was experiencing an emergency and needed to go to the hospital. (Hamlet Dep. at 20.) Because Mr. Ham was serving a misdemeanor sentence and was sentenced on a commitment order, Jailer Ford felt there was no risk that Mr. Ham would fail to return after treatment. (Jailer Ford Dep. at 55, 60-61.) Jailer Ford testified that releasing inmates to their families for medical care is not an uncommon practice among Kentucky's correctional institutions. (Id. at 61.)[2] When Ms. Hamlet and her husband arrived about fifteen minutes later, Mr. Ham was in a wheelchair in the corner. (Hamlet Dep. at 24.) Ms. Hamlet received instructions to take Mr. Ham to Marshall County Hospital ("MCH") and return immediately upon his discharge. (Hamlet Dep. at 23-24.) Mr. Ham was loaded into his sister's Jeep Liberty and the family went immediately to Marshall County Hospital.[3]

Mr. Ham was discharged from the hospital around 11:30 p.m. Mr. Ham and his family returned to MCDC thereafter. Deputy Jailer Robert Milan was on duty when Mr. Ham and his family pulled up to the jail's sally port. Ms. Hamlet gave Mr. Ham's discharge papers to Deputy Milan, and Mr. Ham indicated that he still could not walk. (Hamlet Dep. at 38; Milan Dep. at 10-11, 24.) Deputy Milan observed that the family appeared upset that Mr. Ham had been

---

[1] This statement echoes jail standard 501 KAR 3:090 Section 1(12), which dictates that "[i]f the prisoner is transported to a hospital . . . transport will be provided [by] Deputy Jailer, or Ambulance."

[2] Defendants' expert, James Daley, testified that "a lot of jails historically have allowed family members to transport inmates to get them out of their facility so they don't get saddled with a huge medical bill," but that he did not know whether that occurred in MCDC's case.

[3] Testimony is conflicting as to who loaded Ham into the vehicle. Hamlet testified in her deposition that her husband loaded Ham by himself (Hamlet Dep. at 25), while Deputy Schroader and Deputy Edwin Newcom, Jr. recall Deputy Schroader placing Ham in the vehicle (Schroader Dep. 13-14, 25; Newcom Dep. at 21.) Testimony from all parties, however, indicates that Ham had the use of his arms when he left for the hospital. Hamlet testified that though he was shaking, he was able to hold the handle when her husband loaded him. (Hamlet Dep. at 26, 74.) Deputy Schroader testified that he had Ham put his arms around her neck, and he lifted Ham out of the wheelchair in a cradle position and put him in the vehicle. (Schroader Dep. at 14, 25-26.)

released from the hospital and that they "said there was . . . other stuff going on with him, and . . . they was just mad, I guess, because they didn't get admitted. . . . [T]hey was talking about, they was going to have to get him in to see somebody else." (Milan Dep. at 13-14.)[4]  Jail staff thereafter called Jailer Ford at home,[5] and he arrived roughly fifteen minutes later. (Hamlet Dep. at 38; Milan Dep. at 17.)

Upon arriving, Jailer Ford told Mr. Ham to get out of the vehicle and said that "[Mr. Ham] could walk . . . there wasn't nothing wrong with him [and that] he was fine." (Hamlet Dep. at 39.) He was "cursing," accused them of "partying," and indicated that a strip search would reveal if Mr. Ham "had any dope" on him. (Id.; Ham Jan. 10 Dep. at 135.) Ms. Hamlet denied Jailer Ford's accusations and urged him to call the hospital to confirm the length of their visit. (Hamlet Dep. at 39.) At Ms. Hamlet's request, Deputy Milan gave Ham's discharge papers to Jailer Ford as proof of their visit, and Jailer Ford appeared to familiarize himself with the papers before calling the hospital. (Id.; Milan Dep. at 21.)[6] Mr. Ham's discharge papers indicated that he had been diagnosed with "BILAT[ERAL] LOWER EXTREMITY PARASTHESIA OF UNDETERMINED EITOLOGY." (ER Release, Docket No. 139, Ex. 2.) The papers further indicated that Mr. Ham was to "FOLLOW UP WITH NEUROLOGIST ON MONDAY" and should see his private physician if his symptoms persisted or worsened." (Id.)

---

[4] Deputy Milan also testified that when Mr. Ham first arrived, he witnessed him roll onto his left side and "dig[] around in his crotch," which led him to believe that that Mr. Ham might be able to walk despite his assertions to the contrary. (Milan Dep. at 30-31.)

[5] It is customary for jail staff to notify Jailer Ford at home when an inmate returns from the hospital. (Milan Dep. at 14, 19-20.) Although Deputy Milan is unsure if Jailer Ford regularly returns to the jail after such notification, he remembers him doing so "several times in the past 10 years." (Id. at 16.)

[6] Jailer Ford disputes these facts. He testified that upon arriving he "asked Terrell what the problem was. He said he couldn't get out. And I asked, you know, what his diagnosis was." (Jailer Ford Dep. at 64.) *See also* Jailer Ford Affidavit, Docket No. 133, Ex. A ("I did not cuss or otherwise verbally abuse [Mr. Ham] or his family on February 19th. I did, however, warn Ham that he 'had better make sure [he] didn't have any [contraband] on him when he came back into the jail,' or other similar words to that effect."). Deputy Milan does not remember if Jailer Ford spoke with Mr. Ham before calling the hospital, but remembers immediately giving Jailer Ford the discharge papers after he arrived. (Milan Dep. at 21, 26-27.)

Jailer Ford then stepped away to call the Marshall County Hospital. He spoke with a nurse whose name he cannot recall who informed him that "they could not find [any]thing wrong with him. Possibly a bladder infection." (Jailer Ford Dep. at 64.) Based on his conversation with the nurse and the fact that Mr. Ham had been released from the hospital, Jailer Ford decided to readmit Mr. Ham to the jail. (Id.)

After deciding to readmit Mr. Ham, Jailer Ford returned to the sally port to remove Mr. Ham from the vehicle. When Deputy Milan pulled Mr. Ham out of the vehicle, Mr. Ham "fell to his knees and flat on his face." (Hamlet Dep. at 40.) Mr. Ham "kept telling him that he couldn't get up. He couldn't move his lower body," as Jailer Ford "kept cursing, yelling at him" and had Deputy Milan pick Mr. Ham up underneath his arms and drag him across the sally port to the wheelchair waiting on the other side. (Id. at 41-42.) Mr. Ham remembers the men dropping him again, and "[t]his time [his] face and all hit the concrete. And Roger Ford said, 'Well, you son of a bitch, you can walk because I seen your leg move.'" (Ham Dep. at 138.) The men then lifted Mr. Ham into the wheelchair; after he slid out of the chair, the men were able to put him back into it. (Id.; Hamlet Dep. at 42.)[7]

Before placing Mr. Ham in a medical observation cell, the men searched him for contraband pursuant to MCDC policy. (Milan Dep. at 44; Jailer Ford Dep. at 71.) Deputy Milan recalls that Mr. Ham was able to assist the men in removing his shirt and roll onto his right side to face the wall. (Milan Dep. at 47.) Deputy Milan does not remember Mr. Ham moving his

---

[7] Jailer Ford and Deputy Milan also dispute this account of events. Jailer Ford testified that the pair "got a wheelchair, eased him out into the wheelchair and put him in a medical cell." (Jailer Ford Dep. at 64-65.) *See also* Jailer Ford Affidavit, Docket No. 133, Ex. A ("My deputy and I did not drop Ham or otherwise let him fall to the ground, when we moved him from his sister's vehicle to a wheelchair before he was readmitted to the Jail."). Deputy Milan recalls that Jailer Ford asked him to get a wheelchair for Ham and then the two men "had to pick him up underneath his arms to get him from [the vehicle] to the wheelchair." (Milan Dep. at 28-29.) He denies that Ham fell to the ground at any point during the transition. (Id.)

5

legs at any point during the search. (Id. at 49.) Mr. Ham had no contraband on him and was placed under medical observation. (*See* Jail Log, Docket No. 188, Ex. H.) Though Mr. Ham was once observed holding a blanket over his head, none of the deputies saw him on his feet or moving his legs. (Gardner Dep. at 11; Loe Dep. at 12; Milan Dep. at 57; Schroader Dep. at 12.) At 7:35 a.m., Mr. Ham told Deputy Eugene Loe that he could not get up to see a visitor. Loe noted this on the jail log, but also noted that Ham was "ok."[8] (Loe Dep. at 10-11; Jail Log, Ex. H.) That morning, Jailer Ford called into the jail while he was at a political function in Hardin, Kentucky. (Jailer Ford Dep. at 73.) After learning that Mr. Ham had not been up throughout the night and morning, Jailer Ford spoke with Judge Telle, who was also attending the event, around 10 a.m. (Id. at 73-75.) "The judge said, 'Roger, let's make him a bond. Put him back in court in two or three weeks. Have him to bring me some medical documentation.'" (Id. at 73.)

After Judge Telle directed that Mr. Ham be released to seek additional medical care, MCDC staff called his daughter, Jessica Ham. (Jessica Ham Dep. at 15.) Because she was at work, Jessica missed the call. (Id.) MCDC left a voicemail. (Id.) Although Jessica's shift normally ended at two o'clock, she had to stay at work longer because a coworker arrived late. (Id. at 17.) Jessica "clocked out and checked [her] voicemail, and it was from the jail stating that [she] just needed to come pick [Mr. Ham] up. It didn't say why." (Id. at 15.) Jessica and her children's father, Jon Pace, took her nephews to the jail to pick up her father. (Id. at 17.) When jail staff wheeled her father out, Jessica "started crying because [she] could tell his condition right away. . . . [H]e almost looked dead." (Id. at 24.)

---

[8] Each entry in the jail log includes a description of Ham as "ok." Deputy Milan said that when he wrote "ok," he meant that Ham was "still breathing, and talking, and there wasn't [contraband] found on him." (Milan Dep. at 56.) Deputy Newcom looked to make sure that Ham was "conscious and breathing" while he was in medical observation. (Newcom Dep. at 15.) Jailer Ford indicated that the notation "okay" indicates "okay, I have checked him. Okay, I have talked to him." (Jailer Ford Dep. at 74.)

6

Mr. Ham left MCDC six hours after Judge Telle directed his release, around 3:55 p.m. Jailer Ford and Deputy Newcom attribute this delay to waiting for his family to come pick him up. (Jailer Ford Dep. at 86-87; Newcom Dep. at 26.) Deputy Newcom cannot recall any problem at MCDC that would have prevented a deputy from transporting Mr. Ham to the hospital or an ambulance being called. (Newcom Dep. at 26.) Mr. Ham was admitted into the emergency room at Lourdes Hospital in Paducah at 6:20 P.M. Testing revealed a spinal abscess and cord compression, which required immediate surgery. Despite the surgery, Ham now suffers from paraplegia and weakness in his left arm.

Mr. Ham filed his original complaint with this Court on January 24, 2011, naming as defendants Marshall County; Jailer Ford; MCDC Physician Dr. H.W. Ford; MCDC Nurse Practitioner, Ruby Starks; the Marshall County Public Hospital District Corporation; Dr. Louis Forte; and John and Jane Does, Nos. 1-10, "employees of and health care professionals at the Jail and the Hospital." (Docket No. 1.) He amended his complaint on August 2, 2011 to add Drs. Scott Wilson and William R. Wilson and their practice groups, Sterling Emergency Services of the Midwest, Inc. ("Sterling") and Radiology Associates of Murray, PLLC ("RAM"), respectively. Mr. Ham voluntarily dismissed or assented to summary judgment on his claims against RAM and Dr. William R. Wilson (Docket No. 54), Dr. Forte (Docket No. 56), H.W. Ford (Docket No. 97), and Ruby Starks (Docket No. 112). On November 27, 2012, the Court also granted summary judgment for Defendants Sterling Emergency Services and Dr. Scott Wilson. (Docket No. 148.)

Defendants Marshall County and Jailer Ford moved for summary judgment on Mr. Ham's remaining claims, which alleged violations of 42 U.S.C. § 1983 and state law. The Court's December 19, 2012 Memorandum Opinion and Order granted partial summary

judgment, dismissing all claims against Marshall County and against Jailer Ford in his official capacity. (Docket No. 152.) The Court also dismissed Mr. Ham's claims for the tort of outrage. The Court denied Jailer Ford's motion for summary judgment for violation of Mr. Ham's rights pursuant to 42 U.S.C. § 1983 and for negligence.

In the instant action, Jailer Ford renews his motion for summary judgment, urging the Court to dismiss all remaining claims against him. Jailer Ford argues that a recent Sixth Circuit decision requires dismissal of the claims against him. He further alleges that upon the expiration of discovery and expert disclosure deadlines, Ham has not established the causation necessary to survive summary judgment.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position. Rather, plaintiff the must present evidence on which the trier of fact could reasonably find for him. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for

summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Jailer Ford claims that only three issues remain unresolved: (1) whether he was deliberately indifferent to Mr. Ham's serious medical needs; (2) whether he ignored MCDC's policy that required either jail staff or an ambulance to transport Mr. Ham to the hospital; and (3) whether the six-hour delay between Jailer Ford's call and the arrival of Mr. Ham's family caused any detriment to Mr. Ham's condition. (Docket No. 160-1 at 5.) Jailer Ford argues that none of these questions can be submitted to a jury, as Mr. Ham lacks the medical evidence necessary to prove causation. Specifically, he argues that Mr. Ham cannot prove that his medical outcome would have been different had he been transported to the hospital at approximately 10:00 a.m. rather than picked up by his family at 3:55 p.m. Jailer Ford alleges that no expert has opined otherwise. (Id.)

I. **The Court's December 21, 2012 Memorandum Opinion denying Jailer Ford's Motion for Summary Judgment remains consistent with Sixth Circuit precedent.**

In its prior ruling, the Court opined that a factual dispute existed as to whether Jailer Ford was deliberately indifferent to Mr. Ham's medical needs. "The Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward the inmate's serious medical needs…. Prison officials' deliberate indifference violates these rights [w]hen the indifference is manifested by … prison guards in

9

intentionally denying or delaying access to medical care … for a serious medical need." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895-96 (6th Cir. 2004) (citations omitted).

A plaintiff alleging a constitutional claim for denial of medical care must demonstrate both objective and subjective components. To fulfill the objective component, the inmate must show that he had a sufficiently serious medical need and that the conditions of his incarceration posed a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 825 (1970). To fulfill the subjective component, an inmate must "show that prison officials have a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895. Although deliberate indifference requires a mental state more culpable than mere negligence, the official need not have acted with the purpose of causing harm or knowing that harm will result. Rather, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Id.* at 896 (internal citations and quotations omitted).

Jailer Ford argues that a recent Sixth Circuit decision precludes such a finding in this case. *Smith v. County of Lenawee*, 505 Fed. Appx. 526 (6th Cir. 2012) concerned a pretrial detainee who died as while incarcerated in a county jail. When booking Smith into the jail on Friday, a sergeant noted that Smith, an alcoholic, suffered from tremors. Her symptoms included shaking, hallucinations, loss of appetite, and irrational behavior. The sergeant called the jail's medical director, who prescribed medication for alcohol withdrawal and assured him that "she's on good medicine," that jail would "do her some good," and that he would have a nurse examine her on Sunday. On Monday morning, jail personnel summoned medical help when they observed that Smith had stopped breathing; she died shortly after. Her mother then sued both the county itself

and a number of county officials, claiming that they were deliberately indifferent to the detainee's serious medical needs and asserting a gross negligence claim under state law.

On appeal, the Sixth Circuit held that the sergeant's failure to contact emergency medical services did not constitute deliberate indifference to the detainee's serious medical needs. The Court pointed to precedents cautioning federal courts from second-guessing the medical judgment of treating professionals and constitutionalizing negligence or medical malpractice claims. *Smith*, 505 Fed. Appx. 526, at 532 (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir 1976). The Court further acknowledged that "[i]f a prisoner is under the care of medical experts …, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Smith*, 505 Fed. Appx. 526, at 532 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

Among the named defendants was the sergeant who periodically checked on Smith and opted against transporting her to the emergency room based on the jail physician's advice. The Court found that because a serious medical need existed, the plaintiff had established the objective component of her deliberate indifference claim against the sergeant. However, the sergeant lacked a sufficiently culpable state of mind in denying or delaying medical care, precluding the claim's subjective component. Although hindsight made clear that the sergeant should have obtained medical intervention, he placed Smith in an observation cell and consulted with the jail's physician, who assured him that Smith's condition did not require emergency treatment.

Based on these facts, the Sixth Circuit reversed the denial of summary judgment to the sergeant. "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official … will not be

chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Smith*, 505 Fed. Appx. 526, at 532 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). The Court pointed to the Supreme Court's teaching that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*" *Smith*, 505 Fed. Appx. at 533 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added). Based on the physician's reassurances, "it is understandable that [the sergeant] did not draw the inference that Smith was at substantial risk of serious harm even though he recognized that she was suffering from *delirium tremens*." *Id.* at 534.

The question, then, is whether Ham can establish the subjective component of his claim for deliberate indifference—that is, whether Jailer Ford actually inferred that a substantial risk of serious harm existed. *Id.* (citing *Farmer*, 511 U.S. at 837). Jailer Ford points to a number of factors supporting his assessment. When Jailer Ford contacted medical staff at Marshall County Hospital, a nurse assured him that Mr. Ham did not require additional care. He had no reason to believe that Mr. Ham received faulty care at the hospital, as neither Mr. Ham nor members of his family complained of improper or ineffective treatment. Further, while Ham's discharge papers evinced a diagnosis of "BILAT[ERAL] LOWER EXTREMITY PARESTHESIA OF UNDETERMINED EITOLOGY," there is no indication that such a condition demanded emergent care.

Despite these facts, this Court's previous Memorandum Opinion and Order denying Jailer Ford's original motion for summary judgment remains consistent with *Smith*. In its earlier ruling, this Court held:

> … Ham complained of serious back and neck pain, and ultimately suffered complete paralysis of his lower body that left him unable

12

> to walk. This Court agrees with the Eleventh Circuit's observation that "paralysis is such an uncommon, serious, and traumatic event that even someone without any medical training would have recognized the situation as requiring immediate care by a doctor." *Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 184 (11th Cir. 2012).

Jailer Ford relied upon his conversation with a Marshall County Hospital nurse and upon Mr. Ham's discharge papers in determining to readmit Mr. Ham to the jail. *Smith* counsels that Jailer Ford was entitled to defer to medical professionals in this initial decision. However, the analysis cannot end here; it must also encompass the approximately fourteen hours between Mr. Ham's readmission to the jail and his transport to Lourdes Hospital. Mr. Ham was placed in a medical observation cell overnight, during which time no deputies observed him walking or moving his legs. He continued to complain of immobility when he refused a visit on the morning of February 20. After discussing Mr. Ham's status that morning with MCDC staff, Jailer Ford consulted with Judge Telle about releasing Mr. Ham for further medical treatment that day rather than waiting until Monday. Although Jailer Ford directed that a bond be issued at approximately 10:00 a.m., approximately six hours elapsed before Mr. Ham arrived at Lourdes.

Construing the facts in the light most favorable to Mr. Ham, a jury could determine that notwithstanding Mr. Ham's medical clearance for readmission, Jailer Ford's culpability increased over the fourteen-hour delay and that he at some point developed "reason to believe" that Mr. Ham's condition had not been adequately treated. A prison official may be found deliberately indifferent even after seeking medical treatment for an inmate when, confronted with "continued complaints by [an inmate]" or "manifest symptoms" of a continuing serious condition, the prison official nonetheless fails to seek additional medical attention. *See Cooper v. Dyke*, 814 F.2d 941 (4th Cir. 1987). Where Mr. Ham's continued "symptoms would have

13

made it obvious that [he] required immediate medical attention," a jury could conclude that delaying such required treatment manifests deliberate indifference. A jury might infer that the continued severity of Ham's medical condition—namely, debilitating immobility—at some point constituted an emergency medical situation that obligated Jailer Ford to facilitate additional treatment. Jailer Ford's culpability hinges not on whether he knew that Mr. Ham's family experienced delays in actually transporting him, but whether Jailer Ford should have taken steps to ascertain that fact.

Moreover, Jailer Ford's conduct deviated from MCDC policy, which required jail staff to transport Mr. Ham to the hospital or contact an ambulance to do so.[9] A jury could conclude that Jailer Ford disregarded a substantial risk when he recognized Mr. Ham's need for further medical attention and allowed Mr. Ham to remain at the jail for six hours, awaiting his family's arrival. *See Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (considering a defendant's failure to follow policy as evidence that the subjective prong of a deliberate indifference claim had been satisfied). Although Jailer Ford can point to a number of factors defending his decisions, the Court determines that summary judgment is not appropriate on this measure.

## II. Mr. Ham need not present verifying medical evidence to support his § 1983 claim.

Additionally, Jailer Ford argues that even if he had directed his staff to call an ambulance or transport Mr. Ham to the hospital on Saturday morning instead of calling his family, Mr. Ham has presented no evidence that the outcome would have differed. Having considered the parties' arguments, the Court cannot agree with Jailer Ford.

---

[9] "Transport: If the prisoner is transported to a hospital, or the facility physician's office, transport will be provided [by] Deputy Jailer, or Ambulance[.]" MCDC Medical Emergency Policy (Docket No. 130-1 at 2).

In the Sixth Circuit, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County, Ky.*, 238 F.3d 739 (6th Cir. 2001) (quoting *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3dd 1176, 1188 (11th Cir. 1994)).

Like the *Napier* plaintiff, Mr. Ham has offered no medical evidence indicating that he suffered a detrimental effect from not receiving medical attention earlier on Saturday. However, the Sixth Circuit later clarified that *Napier*'s "verifying medical evidence" requirement applies only to claims involving "minor maladies or non-obvious complaints of a serious need for medical care." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004). "*Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Id.* The inquiry hinges upon whether a lay person would determine that the prisoner plainly required medical care—not the actual existence of such harm.

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity. *In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition*. Blackmore was suffering from appendicitis, and it is sufficient that the officers' delay in treatment of an obvious medical emergency posed a substantial risk of serious harm to Blackmore by subjecting him to unnecessary infliction of pain.

> *[W]here a plaintiff's claims arise from an injury or illness "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated.* Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable timeframe.

*Id.* at 899 (emphases added).

As this Court discussed in its previous ruling, Mr. Ham's sudden and unexplained inability to move his lower extremities was an "obvious manifestation[] of pain and injury." (Docket No. 152 at 16, quoting *Blackmore*, 390 F.3d at 898.) A jury could find a constitutional violation if Jailer Ford allowed six hours to pass before releasing Mr. Ham to obtain medical care, despite Ham's obvious and continuing need for medical treatment. Regardless of the contents of Mr. Ham's expert reports, Mr. Ham need not present "verifying medical evidence" that he was harmed by the delay in treatment, as the constitutional injury does not depend on such a causal connection.

**III.     Mr. Ham's lack of evidence regarding causation precludes his negligence claim.**

Mr. Ham's constitutional claim does not share all elements with his negligence claim, which is grounded in state law. Mr. Ham does not prove that any breach of duty by Jailer Ford caused or exacerbated his injuries. Because Mr. Ham has not established causation, his negligence claim must be dismissed.

Jailer Ford argues that because no evidence suggests that he knew of the six-hour delay of Mr. Ham's family, Mr. Ham's state law negligence claims must be dismissed. In addressing this argument, the Court references its earlier Memorandum Opinion, which stated:

16

> Ham has presented evidence from which a jury could conclude Jailer Ford disregarded [a substantial risk of harm to Mr. Ham]. Despite testimony that nothing prevented a deputy from transporting Ham to the hospital or calling the EMS pursuant to MCDC policy, staff called Ham's family requesting they pick up Ham, who did not arrive until nearly six hours later. A jury could conclude that Jailer Ford disregarded a substantial risk to Ham when he recognized Ham's need for further medical attention, ignored MCDC practice and policy requiring jail staff to transport Ham to this hospital, and instead allowed Ham to remain at the jail for an additional six hours waiting for his family to arrive. *See Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (considering a defendant's failure to follow policy as evidence that he subjective prong of a deliberate indifference claim had been satisfied).

(Docket No. 152 at 15-16.)

Assuming arguendo that Jailer Ford's departure from MCDC policy constituted a breach of his duty to Mr. Ham, Mr. Ham has nonetheless failed to establish causation. Federal Rule of Civil Procedure 26(a)(2)(B) requires a complete statement of a potential witness's opinions.[1] "Under Rule 26(a), a 'report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial.'" *R.C. Olmsetad, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n. 6 (7th Cir. 1998)).

At the close of discovery, no expert testimony suggests that had Mr. Ham been transported to the hospital on Saturday morning, his medical outcome would have improved. Dr. Hadi, Ham's treating neurologist and medical expert, testified that Mr. Ham was a complete paraplegic when he first presented at Lourdes Hospital on the afternoon of Sunday, February 21, 2012; he

could not indicate when Ham became a complete paraplegic.[10] Furthermore, Dr. Hadi's expert report fails to establish causation.[11] His analysis concerns only whether treatment on Friday evening would have changed Ham's outcome, not about the "detrimental effect of the delay" on Saturday. Additionally, Dr. Hadi testified that even had he performed surgery on Ham within twenty-four hours of the onset of his paralysis, odds are slim that Ham would have ultimately regained function. (Dr. Hadi Dep. at 65-66.)

In the only medical testimony regarding the timing issue, Jailer Ford's expert neurosurgeon, Dr. Richard Berkman, opines that Ham was "almost certainly paraplegic" upon his arrival at Marshall County Hospital at 6:20 p.m. on Friday, February 19.[1] Dr. Berkman will testify that when Jailer Ford learned of Ham's complaints on February 19, his paralysis was already irreversible. Dr. Berkman indicates that any delay caused by the determination that Ham's family should transport him to Lourdes did not contribute to his ultimate outcome. (Docket No. 160-3 at 1.)

Mr. Ham neither rebuts Dr. Berkman's testimony nor offers an expert opinion as to when treatment would have been too late. Because Ham cannot establish that Jailer Ford's actions or omissions proximately caused his injury, Jailer Ford is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, it is HEREBY ORDERED THAT:

---

[10] Dr. Hadi Dep. at 63 ("I can't say because I don't have an exam. I don't have an accurate time frame of when . . . he became a complete paraplegic. I just know that when I saw him he was a complete paraplegic.").

[11] Dr. Hadi Expert Report, Docket No. 118-15, at 1 ("As of 2/21/10 at 12:15pm, Mr. Terrell Ham, upon my examination, was an ASIA level A C6 quadriplegic, which is to say he had no discernible function, neither sensory or motor below those controlled by the sixth cervical nerve. This included the ability to use his hands, the ability to use his legs, bowel and bladder control as well as sexual function. It was unclear how long he had been in this [quadriplegic] state.").

1. Defendant's Renewed Motion for Summary Judgment is DENIED as to Plaintiff's § 1983 claim; and

2. Defendant's Renewed Motion for Summary Judgment is GRANTED as to Plaintiff's state law negligence claim.

CC: Counsel